IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-01290-MEH

DOROTHY E. ANGLESTEIN,

    Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

    Defendant.

---

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

    Plaintiff Dorothy Anglestein appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court reverses the ALJ's decision and remands the matter to the Commissioner for further consideration.

## BACKGROUND

### I.    Procedural History

    Plaintiff seeks judicial review of the Commissioner's decision denying her application for DIB filed on October 22, 2012. [Administrative Record ("AR") 315-316] After the application was

initially denied on June 3, 2013 [AR 214-216], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for July 16, 2014 [AR 258-275]; however, the hearing was rescheduled for November 5, 2014 [AR 288-309]. At the hearing, the Plaintiff and a vocational expert testified. [AR 165-199] The ALJ issued a written ruling on November 21, 2014 finding Plaintiff was not disabled starting on July 7, 2011 because Plaintiff could perform her past jobs of insurance agent clerk, billing clerk, telephone solicitor, and mortgage clerk. [AR 158] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination on April 5, 2016, making the SSA Commissioner's denial final for the purpose of judicial review [AR 1-7]. Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.     Plaintiff's Alleged Conditions

Plaintiff was born on November 22, 1953; she was 58 years old when she filed her application for DIB on October 22, 2012. [AR 315] Plaintiff claims she became disabled on July 7, 2011 [AR 333] and reported that she was limited in her ability to work due to multi-level disc degenerative disease, spinal stenosis, and depression.[1] [AR 337] Plaintiff filed a "Function Report" in tandem with her application, in which she explained that she was limited in her ability to work due to memory retention problems; inability to type; pain in her spine, legs, and hips from scoliosis, osteoarthritis, and osteoporosis; and loss of control of legs and bladder. [AR 365] She also noted she had trouble swallowing and her esophagus was "stretched twice." [AR 372]

---

[1] Plaintiff does not challenge any findings by the ALJ concerning her alleged mental impairment(s); therefore, the Court will direct its attention to the Plaintiff's alleged physical impairments.

The record indicates that Plaintiff had been a patient of Susan Dattilo, M.D. since at least August 5, 2010, at which time Plaintiff presented to an emergency room with lower back pain and identified Dr. Dattilo as her primary care provider. [AR 410] At that time, an imaging report revealed a "mild cortical irregularity at the sacrococcygeal junction consistent with the given clinical history of prior coccyx fracture." [AR 415] Later, on November 22, 2010, Dr. Dattilo described Plaintiff as "a previous patient from Oak Springs Family Medicine" on a record from the Matthews-Vu medical office. [AR 540] In her report, the doctor described Plaintiff as having had "an injury to her back and neck many years ago," which led to "a history of chronic neck, upper back, and lower back pain and muscle spasms" for which she was "being prescribed daily narcotics for pain control." [*Id.*]

In April 2011, Dr. Dattilo ordered MRI exams of the Plaintiff's pelvis and lumbar spine; the tests indicated a levoscoliosis, multiple degenerative disc disease (disc protrusions and foraminal narrowing), and trochanteric bursitis. [AR 524] In the coming weeks and months, Plaintiff's pain worsened, so Dr. Dattillo recommended Plaintiff stop chiropractic treatments and referred her to a neurosurgeon. [AR 515] Plaintiff presented to Sana U. Bhatti, M.D. on July 7, 2011, who diagnosed Plaintiff with lumbar spinal stenosis, degenerative disc disease, and lumbar and sacral spondyloarthritis, and recommended conservative pain management first before trying surgery to alleviate pain. [AR 422-423] Plaintiff received epidural injections in her spine and underwent nerve conduction studies, which were normal. [AR 418, 569] In November 2011, an MRI of Plaintiff's cervical spine indicated degenerative changes and foraminal stenosis in the lower cervical spine. [AR 478]

Dr. Dattilo referred Plaintiff for another MRI of her lumbar spine in July 2012, which indicated interval progression of T12-L1 degenerative disc disease and mild lumbar dextroscoliosis [AR 465], and the doctor referred Plaintiff to see a neurosurgeon, Chad, Prusmack, M.D., in August 2012, who determined the Plaintiff would "need a wide laminectomy and a full facetectomy," which would "result in the subsequent need for a fusion." [AR 584]  Plaintiff underwent these procedures on September 18, 2012 [AR 429-430]; Dr. Prusmack "comment[ed] that there was quite severe compression; specifically, actually of the L5 nerve root and there was a far lateral component to this." [AR 582]  On October 31, 2012, Dr. Dattilo noted that Plaintiff was "doing much better overall," was "in much less pain and her range of motion in her back and overall ability to ambulate [was] greatly improved" following the spinal fusion. [AR 630]

After reviewing an MRI performed on Plaintiff on December 12, 2012, Dr. Prusmack determined that she was healing well from the fusion, but noted that an MRI of Plaintiff's cervical spine the previous year revealed "significant cord compression," so ordered a new MRI performed December 28, 2012, which revealed "slightly progressive degenerative changes of the cervical spine when compared to prior study." [AR 581, 677]  In early 2013, Plaintiff complained of right shoulder pain and underwent a "shoulder arthroscopy with subacrominal decompression and distal clavicle excision" in June 2013. [AR 869-70; 879]  Three months after the procedure, the doctor diagnosed Plaintiff with bicipital tendonitis, treated her with an injection, and by November 11, 2013, Plaintiff was "doing much better with her shoulder." [AR 768]  There are no other records from 2013 concerning Plaintiff's lumbar or cervical spinal pain.

Notably, on January 4, 2014, Christopher J. Malinky, M.D., who had been treating Plaintiff

for pain management since February 15, 2013 [AR 580], addressed a letter to Plaintiff informing her that he would no longer treat her after learning that she "breached" her narcotic agreement by receiving prescription narcotics from both Dr. Malinky and Dr. Dattilo "for some time." [AR 815] The next record from January 30, 2014 indicates Plaintiff presented to Alexios Constantinides, D.O. at Front Range Medical Arts "to establish" a "new PCP" because her "physician [was] moving." [AR 852] Plaintiff continued to see Dr. Constantinides for back and leg pain and other health issues; however, on July 10, 2014,[2] she met with Dr. Dattilo to request completion of "disability paperwork." [AR 887] Dr. Dattilo partially completed a "Medical Opinion Regarding Ability to Do Work-Related Activities" form for Plaintiff's counsel, in which she noted, *inter alia*, that Plaintiff could lift and carry less than 10 pounds occasionally and frequently; could sit, stand, and walk during a normal 8-hour workday for two hours at a time; would need to lie down 3-4 times per day; and experienced weakness and numbness in her hands and legs. [AR 817-820] Dr. Dattilo concluded that Plaintiff was limited to less than a full range of sedentary work. [AR 821]

On October 16, 2014, Plaintiff saw Kenneth P. Finn, M.D. as a referral from Dr. Constantinides for a lidocaine injection [AR 912], which he performed on October 29, 2014 [AR 911]. Dr. Finn also ordered images of Plaintiff's lumbar spine, which were performed on November 17 and 18, 2014. [AR 915-918] Essentially, the images revealed there was "no evidence of hardware loosening or fracture" and a "solid interbody fusion," but also "dextroconvex scoliosis of

---

[2]According to the record before the Court, this is Plaintiff's first meeting with Dr. Dattilo since October 2012.

the thoracolumbar junction with the apex at T12-L1"[3] and "moderate to advanced degenerative changes of the disc space at this level." [*See id.*; *see also* AR 917 ("[t]he dextroscoliosis appears more pronounced when compared to a prior study dated 6/4/2010.")]

The remainder of the medical record contains records from Peak View Behavioral Health Center for the period January 19, 2015 through January 29, 2015, at which time Plaintiff was treated for depression and suicidal thoughts. Because no mental impairments are challenged in this case, the Court will not consider these records.

### III. Hearing Testimony

On November 5, 2014, Plaintiff and a vocational expert, Douglas Pruding, testified at the hearing. [AR 165-199] Plaintiff testified that she was "let go" from her job at Time Warner Cable in 2010 for failing to meet sales requirements because of her need to get up and move due to back pain; at the time of the hearing, Plaintiff's back would "freeze up" once or twice daily so that she could not move and the pain, lasting up to 10 minutes, was "very sharp"; after an episode, Plaintiff would have to rest for 10-15 minutes; she could sit for 40 minutes before needing to get up and move; she needed to lie down at least three times per day for up to 30 minutes; she occasionally went to the grocery store, but could not walk from one end to the other without resting; she had been using a cane for two years for balance issues; she could lift and carry 10 pounds, but could not bend

---

[3]"[D]extroscoliosis is a curvature of the spine to the right of the body. ... When it affects the lower back area of a patient, the proper name for the condition is lumbar dextroscoliosis, dextroconvex scoliosis, or dextroscoliosis of the lumbar spine. When a patient experiences the curvature in his upper or middle back, the proper term for the condition is thoracic dextroscoliosis." https://www.reference.com/health/dextroscoliosis-spine-e5f3530105674f60 (last visited November 18, 2016).

over to pick up something from the floor; she felt weakness in her hands and had no feeling in her fingertips for the previous four years; she could not lift more than 5 pounds over her head with her right hand; she had difficulty seeing after cataract surgery; her neck problems had steadied; and she had recently had injections in her back that were alleviating her pain. [AR 169-191]

The ALJ then turned to the vocational expert, Mr. Pruding, who testified that an individual with Plaintiff's age, experience and education—and limited to a full range of light work with no ladders, scaffolds, or unprotected heights, and occasional bending, squatting, kneeling, foot or leg controls, and over-chest-level work—could perform all of the Plaintiff's past jobs of insurance clerk, billing clerk, mortgage clerk, temporary clerk, and telephone solicitor. [AR 192-193] In addition, Mr. Pruding attested the same individual with the same limitations except needing to remain sedentary could perform all of the past jobs except the temporary clerk. [AR 193-194] With the added limitations of needing to get up and move every two hours or needing to be absent more than three times per month, the individual could not perform any of the past jobs. [AR 194] He also testified that the inability to lift anything, bend at the knees, and type would preclude the past jobs. [AR 196-198]

The ALJ issued an unfavorable decision on November 21, 2014. [AR 147-159]

## LEGAL STANDARDS

**I.**     **SSA's Five-Step Process for Determining Disability**

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. § 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. § 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. § 404.1520(g).

**II.     Standard of Review**

This Court's review is limited to whether the final decision is supported by substantial

evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Hamlin*, 365 F.3d at 1214 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

### ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the onset date of her disability, July 7, 2011 (Step One). [AR 152] Further, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine and degenerative disc disease of the lumbar spine status post transforaminal lumbar interbody fusion

(Step Two). [*Id.*] Next, after noting he "considered Listing[] 1.04 and any other listing that may have been applicable," the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 155-156]

The ALJ then determined that Plaintiff had the RFC to perform work at a full range of sedentary, but with the following nonexertional limitations: no ladders, scaffolds, or unprotected heights; occasional bending, squatting, and kneeling; occasional foot/leg controls; and occasional over-chest level work. [AR 156] The ALJ determined the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [*Id.*]

The ALJ proceeded to determine the Plaintiff was capable of performing her past relevant work as an insurance agent clerk, billing clerk, telephone solicitor, and mortgage clerk (Step Four). [AR 158] As a result, the ALJ concluded that Plaintiff was not disabled at Step Four of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 159]

Plaintiff sought review of the ALJ's decision by the Appeals Council on December 8, 2014. [AR 146] On April 5, 2016, the Appeals Council notified Plaintiff that it had determined it "found no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security." [AR 1-4] Plaintiff timely filed her Complaint in this matter on May 27, 2016.

**ISSUES ON APPEAL**

On appeal, Plaintiff alleges the following errors: (1) the ALJ erred in failing to find Plaintiff met Listing 1.04 and failing to evaluate whether she met the listing; (2) the ALJ applied the wrong legal standard in evaluating the treating physician's opinion; and (3) in the alternative, the ALJ erred by failing in his duty to develop the record regarding the functional effects of Plaintiff's physical impairments.

**ANALYSIS**

The Court will address each of the Plaintiff's issues in turn.

**I.    Whether the ALJ Erred at Step Three**

At step three of the sequential process, "the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges as so severe as to preclude substantial gainful activity." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quotation marks and citation omitted). If the ALJ finds that a claimant's impairment does not meet or medically equal a listed impairment, then the ALJ is "required to discuss the evidence and explain why he [or she] found that [the applicant] was not disabled at step three." *Id.*

Here, the Plaintiff contends that the ALJ erred in failing to find she meets Listing 1.04 and in failing even to examine whether she meets the listing. Listing 1.04 is met if a "[d]isorder of the spine (*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture)," results in "compromise of a nerve root (including the cauda equina) or the spinal cord" and at least one of the following:

    A. Evidence of nerve root compression characterized by neuro-anatomic distribution

of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

Plaintiff contends that the evidence demonstrates she meets Listing 1.04A and that, not only did the ALJ fail to make this finding, he failed to evaluate whether she met the listing. In his discussion at step three, the ALJ stated in full:

After a thorough review of the evidence, the Administrative Law Judge finds no evidence to show the existence of any impairment that meets the criteria of any of the listed impairments described in Appendix 1 of the Regulations (20 CFR, Part 404, Subpart P, Appendix 1, Regulation No. 4). Further, no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment. In reaching this conclusion, the undersigned has also considered the opinions of the State agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 416.812; SSR 96-6p). The undersigned has considered Listings 1.04 and any other listing that may have been applicable.

[AR 156]

Notably, in *Clifton*, the Tenth Circuit held that it was a reversible error for the ALJ not to "discuss the evidence or his reasons for determining that [plaintiff] was not disabled at step three, or even identify the relevant Listing or Listings." 79 F.3d at 1009. An ALJ cannot rely on a summary conclusion that a claimant's impairments did not meet or equal any listed impairment, because "[s]uch a bare conclusion is beyond meaningful judicial review." *Id.* On its face, the ALJ's finding at step three in this case appears insufficient in light of *Clifton*, in that it is mostly conclusory, except the ALJ's statement that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." [AR 156] Plaintiff counters that the medical evidence, in fact, contains findings demonstrating she meets Listing 1.04A. The Court agrees in part and will remand this case for further consideration and evaluation.

Plaintiff points to medical records and findings *before* her September 2012 spinal fusion. At the outset, the Court notes that *after* Plaintiff's spinal fusion, the surgeon, Dr. Prusmack, reviewed an MRI performed on Plaintiff on December 12, 2012 and determined that she was healing well from the fusion. [AR 581, 677] There were no further medical records reflecting examinations or images of Plaintiff's cervical or lumbar spine until October 16, 2014, when she saw Dr. Finn for a lidocaine injection [AR 912], which he performed on October 29, 2014 [AR 911]. Dr. Finn also ordered images of Plaintiff's lumbar spine, which were performed on November 17 and 18, 2014. [AR 915-918] Essentially, these images revealed "no evidence of hardware loosening or fracture" and a "solid interbody fusion"; however, they also showed "dextroconvex scoliosis of the thoracolumbar junction with the apex at T12-L1" and "moderate to advanced degenerative changes

of the disc space at this level." [*See id.*] But, as the Plaintiff apparently acknowledges by failing to refer to these records, neither the images nor the doctor's treatment notes reflect the impairment(s) necessary to meet Listing 1.04A.

With that said, the case law supports an ALJ's grant of disability benefits for a "closed period." *See Newbold v. Colvin*, 718 F.3d 1257, 1260 (10th Cir. 2013). Thus, it is possible that the medical evidence in this case supports a finding of disability under Listing 1.04A for the period from Plaintiff's onset date of July 7, 2011 through December 2012, when Dr. Prusmack determined Plaintiff was improved and the spinal fusion was a success. For this period, the Court finds the evidence reflects Dr. Prusmack "comment[ed] that there was quite severe compression; specifically, actually of the L5 nerve root and there was a far lateral component to this." [AR 582] Moreover, Dr. Dattilo found Plaintiff had "motor weakness bilaterally in her legs" on May 24, 2011 [AR 519]; was using a cane to walk on July 1, 2011 [AR 515] and September 20, 2011 [AR 505]; straight leg raise bilaterally was positive on July 7, 2011 [AR 423]; Plaintiff reported to Dr. Dattilo on August 10, 2011 that she "had [a] complete loss of sensation in her right buttocks and her upper right leg" [AR 509]; on September 2, 2011, Dr. Dattilo noted on examination that Plaintiff had "somewhat limited range of motion in her spine today due to the spasticity of the paraspinous muscles" [AR 507]; Dr. Dattilo noted on September 27, 2011 that Plaintiff "walk[ed] with a slow gait using a cane, secondary to the pain in her lower back" [AR 503]; Dr. Dattilo noted on October 25, 2011 that Plaintiff had "bilateral arm and leg weakness with more pronounced paresthesia in the right arm and leg" [AR 496]; on February 2, 2012, Dr. Dattilo noted on examination that Plaintiff had "decreased range of motion due to pain" in her cervical spine [AR 620]; Larry D. Gee, M.D. noted on

14

examination on May 4, 2012 that Plaintiff had "decreased range of motion cervical spine, marked decrease range of motion lumbar spine with flex about 20 degrees tender paraspinous muscles lumbar both sides" [AR 610]; Dr. Dattilo noted on examination on July 20, 2012 that Plaintiff had "severe lumbar paraspinous muscle spasms and pain with radiation into buttocks and legs" [AR 604]; on August 9, 2012, Dr. Dattilo noted on examination that Plaintiff's "strength in the legs are reduced bilaterally, difficult to elicit deep tendon reflexes" [AR 602]; and Dr. Prusmack noted on August 13, 2012 that on examination Plaintiff had a positive right straight leg raise [AR 584].

The Court concludes that this, and possibly other evidence in the record, demonstrates that Plaintiff's spinal impairments possibly met Listing 1.04A [*i.e.*, (1) a disorder of the spine resulting in "compromise of a nerve root or the spinal cord"; (2) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, (3) limitation of motion of the spine, (4) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, (5) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)] for the period July 7, 2011 through December 2012. However, without any analysis by the ALJ or his consideration of these findings, the Court "should not properly engage in the task of weighing evidence" here and, thus, the "case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence at step three." *Clifton*, 79 F.3d at 1009.

**II.    Whether ALJ Failed to Weigh and to Give Adequate Deference to Treating Physician**

Plaintiff contends the ALJ failed to give controlling weight or, at least, he should have given the greatest weight, to Dr. Dattilo's July 10, 2014 opinion concerning her physical impairments. No party disputes that Dr. Dattilo was one of the Plaintiff's treating physicians. As set forth above, Dr.

15

Dattilo partially completed a "Medical Opinion Regarding Ability to Do Work-Related Activities" form for Plaintiff's legal counsel, in which she noted, *inter alia*, that Plaintiff could lift and carry less than 10 pounds occasionally and frequently; could sit, stand, and walk during a normal 8-hour workday for two hours at a time; would need to lie down 3-4 times per day; and experienced weakness and numbness in her hands and legs. [AR 817-820] Dr. Dattilo concluded that Plaintiff was limited to less than a full range of sedentary work. [AR 821]

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215 (citing 20 C.F.R. § 401.1527(d)). The ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight he assigns to them." *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (internal quotation marks omitted). The applicable regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians, and "nonexamining" (or "consulting") physicians. *See* 20 C.F.R. § 416.927(c).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must first determine whether the opinion is conclusive–that is, whether it is to be accorded "controlling weight" on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330. If the opinion is not supported by medically acceptable evidence, then the inquiry at this stage is complete. *Watkins*, 350 F.3d at 1300. However, if the ALJ "finds that the opinion is well-supported, he must

then confirm that the opinion is consistent with other substantial evidence in the record ." *Id.* If not, the opinion is not entitled to controlling weight. *Id.* In contrast, if the medical opinion of a treating physician is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must give it controlling weight. *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)).

If the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must move to step two and consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Id.* "An ALJ may dismiss or discount an opinion from a medical source only if his decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if he provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)).

It is error for an ALJ not to adequately state and explain what weight he gives to medical opinions. *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ must give "good reasons" for the weight he ultimately assigns each medical opinion. *Watkins*, 350 F.3d at 1301. The ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, and the reason for that weight. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Even though an ALJ is not required to discuss every piece of evidence,

it must be clear that the ALJ considered all of the evidence. *Clifton*, 79 F.3d at 1009-10. "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. Boilerplate language, unconnected to any evidence in the record, will not suffice to support an ALJ's conclusion. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). An ALJ may reasonably give less weight to a medical opinion that differs from that same doctor's notes. *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

In discussing Dr. Dattilo's opinion, the ALJ stated:

As for the opinion evidence, on July 10, 2014, the claimant's primary care doctor provided a medical source statement for this case, in which she opined that the claimant is only able to lift less than 10 pounds occasionally. She can stand/walk fewer than two hours and sit less than two hours with normal breaks in an eight-hour workday. She requires a cane to ambulate and is a fall risk. She is limited in reaching, handling, fingering, feeling, pushing, and pulling because of weakness in the arms, hands, and legs. She can occasionally use the feet to operate foot controls but can rarely stoop and climb stairs and can never twist, crouch, or climb ladders. She would be absent more than three times per month because of her conditions and the associated treatment. She would need to lie down at unpredictable hours three to four times per workday. She cannot travel without a companion for assistance, use public transportation, or engage in activities such as shopping (Ex. 15F). The opinion is not supported by the treatment history showing that the claimant's low back pain improved significantly after the September 18, 2012 TLIF (Ex. 5F, 12F). It is called into question by this provider's concurrent treatment notes. July 20, 2014, [sic] progress notes include a conclusory statement that the claimant is not able to work full or part time due to pain and paresethesia. But the physical examination portion of the report documents no musculoskeletal, neurological, or other abnormalities (Ex. 22F). It is not wholly supported by the objective clinical findings. For example, a December 28, 2012, MRI of the cervical spine resulted in an impression of only slightly progressive degenerative changes of the cervical spine, straightening of the normal cervical lordosis, no significant central canal stenosis or significant neural foraminal narrowing, and only mild degenerative changes at C4-C7 and minimal bilateral neural foraminal narrowing at C5-C6 (Ex. 5F). The August 2011 EMG/ nerve conduction study was normal, showing no electrodiagnostic evidence of

radiculopathy or neuropathy (Ex. 6F).  The opinion can only be given little weight.
[AR 157-158]  The ALJ's evaluation appears to omit any findings by Dr. Dattilo before the surgery.

Mindful of the Tenth Circuit's admonition, "it must be clear that the ALJ considered all of the evidence" (*Clifton*, 79 F.3d at 1009-10), the Court finds that the ALJ's evaluation of Dr. Dattilo's opinion clearly omits any mention of the evidence and findings by Dr. Dattilo listed in the previous section.  Accordingly, because the Court remands the matter for the ALJ's consideration of such evidence for his step three analysis, the Court also directs that the ALJ take such evidence into consideration for his evaluation of Dr. Dattilo's opinion.  In fact, the Court notes that Dr. Dattilo implies an incorporation of Plaintiff's history and the doctor's previous findings in her July 10, 2014 "progress notes," where she states, "[Plaintiff] continues to have neck and back pain chronically from spinal stenosis, degenerative spinal changes." [AR 887-888]

### III.     Remaining Issues

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal."  *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 1348 n.1 (D. Colo. 2014).  The Court expresses no opinion as to the Plaintiff's remaining arguments, and neither party should take the Court's silence as implied approval or disapproval of the arguments.  *See Watkins*, 350 F.3d at 1299 ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand.").  The Court also does not suggest a result that should be reached on remand; rather, the Court encourages the parties, the ALJ, and the Commissioner on remand to consider fully and anew the evidence and all issues raised.  *See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the

case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citation and quotation marks omitted).

## CONCLUSION

In sum, the Court concludes that the ALJ failed to apply the correct legal standards in discussing his finding at step three of the sequential analysis and in evaluating the treating physician's opinion regarding Plaintiff's physical impairments.  Therefore, the decision of the ALJ that Plaintiff Dorothy Anglestein was not disabled since July 7, 2011 is REVERSED AND REMANDED to the Commissioner for further consideration in accordance with this order.

Dated at Denver, Colorado this 28th day of November, 2016.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge